# Sims, et al. v. Birden.

### Bill to Vacate Homestead Decree.

(Decided November 23, 1916.   73 South. 379.)

1. **Homestead; Evidence; Burden of Proof.**—Where the action was to set aside a decree vesting a homestead in respondent as the widow of her deceased husband, complainant had the burden of proving the allegation that she was a daughter of the deceased husband by his first wife.

2. **Husband and Wife; Issue; Presumption and Burden.**—A child born in lawful wedlock is presumed legitimate until the contrary is properly shown by the party who denies its legitimacy, and the burden rests upon the one interposing the denial.

3. **Evidence; Presumptions; Pro-creation.**—There is no presumption in our courts that a female at the age of fifty years is incapacitated to procreate.

4. **Homestead; Evidence.**—The evidence examined and held insufficient to show that complainant, seeking to have the decree of homestead vacated, was the daughter of the deceased husband by his first wife.

(Mayfield, Gardner and Thomas, JJ., dissent.)

APPEAL from Montgomery Chancery Court.

Heard before Hon. O. S. LEWIS.

[Sims, et al. v. Birden.]

Bill by Zalena Birden against Katie Sims and others to set aside and vacate a decree of the probate court setting off a homestead, and vesting the same absolutely in Katie Douglass, now Katie Sims. From a decree granting the relief prayed, respondents appeal. Reversed and rendered.

It appears that Wiley Douglass died in 1913, and that Katie Sims, then Douglass, is the widow of said Wiley Douglass, and that said Douglass left 150 acres of land which was set apart by the probate court as a homestead to said Katie Sims, and vested absolutely in her by a decree of the probate court; said Katie Sims alleging that she was the widow and only heir and distributee of the estate. Complainant sets up that she is a daughter of Wiley Douglass and Ann Douglass, his first wife.

HILL, HILL, WHITING & STERN, and W. R. COOPER, for appellant. THOMAS & WILEY, for appellee.

McCLELLAN, J.— (1) The single question contested here is whether complainant (appellee) is the daughter of Wiley and Ann Douglass, who were members of the negro race, one of whom, the former, died in 1913, and the other, the latter, died in 1909. The complainant by her bill attributes her parentage to Wiley and Ann Douglass, thereby assuming the burden of proof to that end. If the evidence sustained the complainant's affirmation that Ann was in fact her mother, then the well-recognized evidential presumption of complainant's legitimacy was applicable to her advantage; Ann and Wiley being at the time of her birth husband and wife.

(2) A child born in lawful wedlock is presumed legitimate until the contrary is properly shown by the party who denies its legitimacy, and upon whom the burden then rests to sustain his denial.—*Weatherford v. Weatherford*, 20 Ala. 548, 56 Am. Dec. 206; *Bullock v. Knox*, 96 Ala. 195, 11 South. 339; *Lay v. Fuller*, 178 Ala. 375, 380, 59 South. 609; 8 Ency. of Ev. pp. 163, 164; 5 Cyc. pp. 626, 627. The reason and purpose of the law which raises this rebuttable presumption is very well stated in *Cannon v. Cannon*, 7 Humph. (Tenn.) 410. A basis for this presumption is not, of course, present unless the child was in fact born to the mother who then was lawfully wedded. So the primary inquiry raised by the issue indicated is whether Ann Douglass, now deceased, was the mother of the complainant (appellee) ; and on

this particular primary inquiry the stated presumption is without bearing or effect.

As appears, the issue is one of fact, and upon it the parties have examined a great number of witnesses, a large majority of whom are negroes. In denial of complainant's assertion of parentage the respondents assert that she was the child of a negro called Carrie, who was delivered of this child at the home of Ann and Wiley Douglass, and that the child was reared, maintained, educated, and treated by them as their own offspring. The evidence has been very carefully considered. The truth of the matter is not of easy solution. Against a conclusion either way much argument might be suggested. Nevertheless the issue is to be here determined de novo on the written testimony on which the cause was submitted for the chancellor's decision. In his opinion, preceding the decree adjudging that complainant is entitled to the relief sought, he affirms that, after a careful consideration of all the testimony, he is "reasonably satisfied from the evidence that Zalena Birden is the daughter of Ann Douglass." The burden of proof on this particular inquiry being on the complainant, we are not able to say that it has been discharged, with the result that our conclusion does not accord with that prevailing below. It is not practicable, if indeed at all desirable, to undertake anything approaching a minute review of the whole evidence bearing on the stated inquiry. It must suffice that we indicate, in a general way, the reasons of fact and circumstance which seem to this court to require the conclusion at which, after all due caution and consideration, the court has arrived.

(3) According to her testimony, the complainant was 26 years of age when she was examined in September, 1915. It is to be accepted that she was born in either 1888 or 1889. There can be no legal doubt, on the whole evidence, that Ann Douglass was a woman at least 50 years of age at the time of complainant's birth. While there is much evidence that Ann was a woman of strong physique at that time and some evidence that she was then about 40 years of age, yet the great preponderance of the testimony admits of no escape from the conclusion that she was fully 50 years of age at the time of complainant's birth. At that age (50 years) there is no presumption in our courts of female incapacity to procreate.—16 Cyc. pp. 1073, 1074, and notes 1 and 2; *Apgar's Case*, 37 N. J. Eq. 502, note on pages 502-504; Tay-

[Sims, et al. v. Birden.]

lor's Med. Juris. p. 642; 2 Whitthaus & Becker, Med. Juris. pp. 404, 405. So we eliminate from consideration recognition or assumption of a presumption unfavorable to Ann's maternity of this complainant based alone upon Ann's age (50 years or more) at the time of her birth.

It appears without any doubt, that Ann and Wiley bore the relation of husband and wife within a very few years after the War in 1865. At the lowest calculation they had cohabited for upwards of 20 years before 1888. A brother of Wiley Douglass, who lived near by Wiley and Ann for a great part of their married life, testified that this complainant was the only child they ever had; that "they had been married about 25 years or little more than that before she [complainant] was born." By other testimony, justly to be credited, this testimony of the brother of Wiley Douglass is strongly, convincingly, corroborated. The conclusion is not to be escaped that, if this complainant is the child of Ann, she is the only child borne by Ann Douglass during approximately 25 years of her wifehood to Wiley Douglass prior to the asserted birth of this complainant. Many witnesses testify that Ann and Wiley declared she was their child; that in infancy they saw her at the breast of Ann; that Ann and Wiley treated her as their own offspring. On the other hand, many witnesses contradicted these subjects of testimony, except as to the undoubted fact that Ann and Wiley bestowed upon this child all the care and generosity people in their station and circumstances could be reasonably expected to bestow upon their own offspring; and these many opposing witnesses say that a woman called Carrie bore this child; gave her to the childless Ann, leaving the home of Ann when the child was but a few months old. It is shown without any real dispute that Ann and Wiley at least sought to adopt a child some time in the 80's. This fact serves to further confirm the view that Ann and Wiley had no children, and that their opinion was that they would continue childless. There is a notable absence of evidence tending even to show physical resemblance of the complainant to either Ann or Wiley Douglass. This omission is rendered more impressive, more significant, when it is considered, as the evidence clearly shows, that Ann and Wiley were both dark members of their race, and complainant is very much lighter in color. While it is not at all impossible, it is quite improbable, that the offspring of two black negroes should be of a marked lighter hue.

If Ann bore no child during 25 years or more of cohabitation with Wiley (and it is not claimed that any other man ever had access to her), begininng when she and he were young, it is not at all probable that when she had more than passed the meridian of life she would develop a capacity of procreation that in all these years she had not shown. It is not impossible that that could be; but it is certainly highly improbable. Several witnesses testify that Ann told them she was barren. That she had strong reason to so conclude, as from the history of her life up to 1888, at least, is, we think, clearly demonstrated by the evidence in this record.

Some of the testimony cannot be reconciled with other testimony touching the same inquiry; but much of that that appears to be contradictory may be reconciled. It is altogether reasonable that witnesses now testifying should have mistaken or misinterpreted declarations by Ann or by Wiley that this was their child, when the declarations meant no more than to voice a descriptive expression of a relation that, because of nurture from birth and affection generated through long association, care, and kindliness, had come to mean to them what that relation signifies to those who are in fact the parents of a child. Again, the testimony of the witnesses who say they saw Ann nursing this child at her breast more than 25 years before may well be but the innocent exaggeration of the undoubted fact that Ann carried and cared for this complainant in her infancy. After so great a period has elapsed even the well-intentioned might mistake embrace of a negro infant by a kindly old negro woman for the actual act of feeding the child in nature's normal way. There is pointed criticism in the brief of appellee's solicitors of the patent fact that, with one exception, the witnesses who say complainant's mother was a woman called Carrie could not give her surname, or aught else about her than that she was a great-niece of Wiley Douglass, and that she came from and returned to Birmingham in 1888. If the testimony of these witnesses was all the evidence contradictory of the complainant's contention, there might be little reluctance in declining to credit their statements in this respect. However, the other predominant facts to which we have referred—mainly, the childlessness of Ann and Wiley for a quarter of a century of their married life before and up to the time this child was born—give to the testimony of the many witnesses who testify to Carrie's motherhood of the complainant

[Sims, et al. v. Birden.]

a crediting effect, a convincing reliabiilty that persuades this court to its stated conclusion.

(4) The complainant has not sustained her right to relief. It was error to accord the relief prayed.

The decree is reversed. A decree will be here rendered dismissing the bill.

Reversed and rendered.

ANDERSON, C. J., and SAYRE and SOMERVILLE, JJ., concur.
MAYFIELD, GARDNER and THOMAS, JJ., dissent.

MAYFIELD, J.—In my judgment the fatal error of the majority in this case is in misplacing the burden of proof. The opinion in effect and in terms places the burden of proof on appellee, to prove that she is the lawful child of Ann Douglass, and is not therefore a bastard.

She was not attempting to show right of inheritance from Ann Douglass, but such right from Wiley Douglass, the husband of Ann Douglass. Appellee was required to show only the right to inherit from Wiley Douglass. Filiation between her and Wiley Douglass was shown without dispute; but her illegitimacy was attempted to be shown by appellants, who sought to prove that notwithstanding she was born in Wiley Douglass's house, was reared to womanhood by him and his lawful wife, Ann Douglass, and was treated by them as their child during their lives, she was in fact a bastard, born of a negro girl named Carrie, and was therefore not the lawful child of either Wiley or Ann Douglass. And the court places the burden of proof on appellee to disprove this theory of appellants, brought forward by them for the sole purpose of disinheriting her. The undisputed facts, standing alone, showed her to be the legitimate child of Wiley Douglass. How is it that, when appellants seek to explain away these undisputed facts, the burden falls on appellee to prevent the appellants from so explaining them away? Suppose appellee had alleged the undisputed facts in this particular: They would have clearly supported the allegation and conclusion that she was the legitimate child of Wiley Douglass and entitled to inherit his estate. Appellants, of course, must confess undisputed facts, and avoid them in order to dispute her right; this they do, by alleging and seeking to prove—notwithstanding the undisputed fact of filiation between appellee and Wiley Douglass.

—that she was in fact born of a girl, Carrie, who was not the wife of Wiley Douglass, and that she was therefore a bastard. And yet the effect of the court's holding is that the burden of proof is on appellee to disprove the disputed facts relied on by appellants to disinherit her.

This court, in a very recent case, has announced the correct rule as to what is necessary to prove filiation, and the effect of it, when proven, to show legitimacy, and upon whom the burden of proof, rests in such cases—which pronouncement, in my judgment, is diametrically opposed to both the opinion and the decision in this case. That there may be no mistake about it, I quote it here: "Filiation, the relation of parent and child, may be established 'by a satisfactory combination of facts indicating the connection of parent and child between an individual and the family to which he claims to belong.' 'The principal of these facts are said to be that the individual has always borne the name of his father to whom he claims to belong; that the father has treated him as his child, and in that character has provided for his education, his maintenance, and his establishment; that he has been uniformly received as such in society; and that he has been acknowledged as such by the family.'—*Weatherford v. Weatherford,* 20 Ala. 548, 56 Am. Dec. 206. * * * If filiation is established, the law raises the presumption of legitimacy, and the burden of proof is on the party who asserts illegitimacy to prove it. *Weatherford v. Weatherford* [*supra*]."—*Lay v. Fuller, et al.,* 178 Ala. 375, 380, 59 South. 609, 610.

It will be observed that what is said as to the sufficiency of proof is quoted from the case which involved the legitimacy of the offspring of the famous Indian, Weatherford. Every fact there mentioned is here shown without dispute.

A case very similar to the one in hand, both as to the nature and purpose of the bill, and as to the facts, is that of *Metheny v. Bohn,* 160 Ill. 263, 26, 267, 43 N. E. 380. Cases nearer alike than these two cannot be hoped to be found. In the *Metheny Case* (among others upholding the legitimacy of a child situated as appellee is, in this case), it is said: "It is alleged by appellants that as the complainant filed this bill for partition against the defendant Leonnetta C. Metheny, who is a minor, the burden of proof is upon him to make out and prove his case on the point of his heirship by a preponderance of the evidence. The complainant was a minor, and, as is abundantly shown by competent

[Sims, et al. v. Birden.]

testimony, was brought up in the family of Samuel Bohn and Lucinda Bohn as their lawful offspring, they living together as husband and wife. He was always treated and recognized as their child by them and others. This affords prima facie evidence of his parentage and right to inherit, and the burden of disproving parentage and right to inherit is thus cast upon defendants.—*Illinois Land & Loan Co. v. Bonner*, 75 Ill. 315. * * * At the time of the appearance of Charles D. Bohn, the father, Samuel Bohn, was about sixty-three years of age, and the mother, Lucinda, was about forty-nine. They had previously adopted a daughter and had proposed to adopt a son. They had taken a male infant from a foundling asylum with such purpose in view in September previous and after retaining it for some three weeks returned it to the asylum. Certain neighbors who were not taken into the confidence of the family seemed to doubt the paternity of the child, Charles D., when he appeared. Appellants' counsel sought to show these doubts, rumors, etc., which sprang up with the appearance of the infant, which evidence was excluded by the court. That evidence was not admissible, and such suspicions, doubts and rumors do not rise to the dignity of a controversy that would exclude declarations made thereafter by the father. Idle speculations of those whose curiosity may be aroused as to the possible paternity of a child cannot make an issue as to legitimacy or heirship, nor furnish a basis of an evidentiary fact that requires disproval or affects the question of the burden of proof."

The above has been often quoted, and approved, and I am unable to find anything to the contrary in any of the books.

In the case of *Zachmann v. Zachmann*, 201 Ill. 380, 383, 66 N. E. 256, 257 (94 Am. St. Rep. 180), it is said: " 'A legitimate child is he that is born in lawful wedlock or within a competent time thereafter.'—1 Blackstone's Com. 446. A minor child reared in the family of a lawfully married husband and wife who are living together as husband and wife, and is treated and recognized as their lawful offspring, is prima facie to be regarded as the child of the husband, and the burden of disproving such parentage is cast upon those denying it.—*Metheny v. Bohn*, 160 Ill. 263 [43 N. E. 380]."

The law is said to be a reasonable master; and rules of evidence are established and maintained to promote justice, and not to work injustice or oppression. The rule adopted by this

court, in my judgment, tends to destroy vested rights and relations, and to disorganize society. From its general recognition and enforcement hosts of citizens would be adjudged bastards and illegitimates, simply because they are unable to obtain proof necessary to overcome the presumption of the law that they are such—as, for instance, where they are probably the legitimate offspring of a mother or father of whom they have never heard until those whom they believed to be such are dead. In my judgment, such a presumption of law as is indulged in this case must of necessity tend to defeat justice, to promote strife and litigation, and to disturb society.

If it be to the interest of any one to dispute the maternity or paternity of another, it behooves the latter to have some record or indestructible evidence of the legitimacy of his birth, before the witness thereof shall die. There are but few people of the age of this appellee, whose reputed fathers and mothers are dead, who could disprove that they were the child or children of some other person who is dead, or whose locus cannot be ascertained except by the merest rumor.

It is conceded that it is not at all probable that every person who has an interest and a desire to acquire the birthright and inheritance of another, would be able to obtain as many witnesses, or even as much evidence, to dispute the claim of legitimacy of the one they desire to disinherit, as appellants have obtained against appellee in this case; but at the same time there are very few who could obtain more evidence, to establish legitimacy, than appellee has obtained under similar circumstances. In other words, I concede that there is much evidence in this case which, if believed, tends to show that appellee was an illegitimate child; but not enough to overcome the presumption of the law which I think, under the undisputed facts, should have been indulged in her favor, nor to overcome the positive evidence in support of the presumption which appellee was fortunate enough to obtain.

Of course I cannot, and do not, profess to speak for the majority, but I do not believe the majority would feel as they do, if the presumption of law indulged against appellee were indulged for her. I doubt that they would reach the same finding, if the case were considered alone on the evidence introduced— that is, without presumption one way or the other. And why a presumption of illegitimacy should be indulged against a per-

[Sims, et al. v. Birden.]

son, I am unable to apprehend. The direct, positive evidence which disinherits appellee is certainly not above suspicion. Neither its quantity nor its quality exceeds that of the evidence which proves her legitimacy; and why the law should indulge a presumption sufficient to bastardize her I cannot understand.

Suppose it were the paternity only, of appellee, which was involved and disputed: Would the law then indulge the presumption to bastardize, rather than legitimatize her? I think not; and I think we have cases expressly holding the contrary, some of which are cited in the majority opinion. If the law indulges the presumption in favor of legitimacy, as to one parent, why does it not, under the same circumstances, indulge the same presumption as to both parents? And why deny it as to one, because there is a dispute or doubt as to the other?

I know that the court has not said in terms that it indulged the presumption of the illegitimacy of appellee; but I submit that it is the necessary result of the holding. The court does say in terms that "the burden of proof on this particular inquiry, being on complainant." That inquiry was whether appellee was the daughter of Ann Douglass (which would make her legitimate), or the daughter of a girl who seems to have had no name but "Carrie," and of whom it was known only that she came from Birmingham to the house of Ann Douglass to be delivered of this child, and returned to that place thereafter, supposedly, but that she had not been heard of in a score of years. If the daughter of "Carrie," she was a bastard, and disowned by her nameless, nomadic mother, with no proof whatever, direct or circumstantial or in the nature of rumor, concerning her father. The real question or dispute, as stated in the majority opinion, was whether appellee was the lawful child of "Ann Douglass," or the natural child of nameless "Carrie;" and the court holds that the burden of proof was on appellee to prove that she was the child of the former, and therefore a legitimate, and not on appellants to prove that appellee was the child of nameless, nomadic "Carrie," whom appellee probably never heard of until this suit was begun. In other words, appellee must assume the burden of proving a negative—that is, that she was not the daughter of this girl "Carrie," whom she has no recollection of ever having seen, and whom she had certainly not seen for more than 20 years, and from or of whom, so far as the proof shows, she had never heard before this suit was begun or contemplated.

[Sims, et al. v. Birden.]

.Appellee's right to inherit from the man and woman who raised her, nurtured her, and educated her, and who had always treated her as their legitimate child, was disputed solely on the ground that this girl, Carrie, was her mother; and the law, it is said, places the burden on her to disprove the fact that she is a bastard, before it will allow her to inherit from the man and woman who all their lives treated her just as if she were their legitimate child, and in whose home the undisputed evidence shows she was born, and which she never left until she was married and went to a home of her own.

I cannot escape the conclusion that the effect of this decision is to hold that before one can inherit from one's reputed father, who has raised him and nurtured him, and ever treated him as his child and the child of his lawful wife, one must assume the burden of disproving the fact of one's illegitimacy. I understand the law to be that when such filiation as is shown in this case without dispute is made to appear, the law raises the presumption of legitimacy, and that the burden of proof of the contrary is on him who asserts illegitimacy, and not on the child—*Lay v. Fuller*, 178 Ala. 375, 59 South. 609; *Metheny v. Bohn*, 160 Ill. ‛263, 43 N. E. 380.

The undisputed evidence in this case shows that appellee was either the legitimate child of Ann Douglass or the illegitimate child of a girl named Carrie. It shows that appellee was born in the house of Ann Douglass and her husband during wedlock, and ever thereafter remained a member of that family and bore the relation of a child to Ann and her husband. It shows that the girl, Carrie, was not a member of this household that if she was ever in Ann's house it was for the purpose of concealing her shame and of being delivered of a bastard child. These facts being conceded or shown without dispute, it seems to me to be a hard and unnatural rule of law which would require appellee to go forward with positive proof that Ann Douglass, and not Carrie, gave her birth. And, her supposed mother and her supposed father—the only other members of that household—are dead, and "Carrie" cannot be found; indeed, has not been heard of for 10 or 20 years; yet the law says to appellee: "You must introduce other and direct proof that Ann, and not Carrie, gave birth to you, in that house where you were born, and reared by Ann to womanhood, and whose roof you never left."

[Sims, et al. v. Birden.]

In my judgment the following authorities declare the law to be entirely different from the law as decided in this case, and I find none which supports the decision or that is contrary to those hereafter cited: *Lay v. Fuller, supra; Metheny v. Bohn, supra; Johnson v. Dudley,* 4 Ohio Dec. 243; *Johnson v. Johnson,* 1 Desaus. (S. C.) 595; *Caujolle v. Ferrie,* 23 N. Y. 90; Jones on Ev. (2d Ed.) § 93; 1 Wig. on Ev. § 269; *Goodrich v. Moss,* 1 Cowper, 594.

GARDNER and THOMAS, JJ., concur in the views of the writer.